UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

DAREN KATHRYN EDDY,               )
                                  )
                Plaintiff,        )            3:19-CV-00376-DCLC
                                  )
        vs.                       )
                                  )
BLUECROSS BLUESHIELD OF           )
TENNESSEE, INC.,                  )
                                  )
                Defendant.        )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Daren Kathryn Eddy ("Eddy") filed this action against her former employer Blue

Cross Blue Shield of Tennessee, Inc. ("BCBS") alleging discrimination, failure to accommodate,

and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101,

*et seq*., the Tennessee Human Rights Act[1] ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq*., the

Tennessee Disabilities Act[2] ("TDA"), Tenn. Code. Ann. § 8-50-103, *et seq*., and the Tennessee

Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304 [Doc. 28].   Eddy also alleges

intentional infliction of emotional distress ("IIED").  BCBS filed a motion for summary judgment

on all claims [Docs. 43-45], to which Eddy responded [Docs. 47-57] and BCBS replied [Docs. 58,

---

[1]     Eddy claims discrimination, retaliation, and failure to accommodate under both the TDA and the THRA [Doc. 28, ¶¶ 72-80]. When a plaintiff alleges disability discrimination under the TDA, "there is no separate claim of disability discrimination under the THRA." *Whited v. Community Bank of the Cumberlands, Inc*., 2010 WL 605280 at *8 (M.D. Tenn. 2010); *see also Thompson v. UGL Unicco Service Co.,* 750 F. Supp. 2d 907, 912-13 (W.D. Tenn. 2010) ("[THRA disability claims] have been treated as being alleged under the TDA.") (internal citations omitted). Accordingly, any separate claims alleged under the THRA are dismissed.

[2]     "A claim brought under the [TDA] is analyzed under the same principles as those utilized for the [ADA]." *White v. Interstate Distributor Co.,* 438 F. App'x 415, 418, n. 1 (6th Cir. 2011). Therefore, unless stated otherwise, the Court will use the same analysis for both.

59]. For the reasons stated herein, BCBS's motion for summary judgment [Doc. 43] is **GRANTED** in part and **DENIED** in part.

## I.    FACTUAL BACKGROUND

Eddy is a pharmacist licensed by the state of Tennessee, and BCBS is a Medicare Part D plan sponsor that provides health insurance benefits for Medicare-covered patients [Doc. 28, ¶¶ 15, 16]. On May 7, 2018, BCBS hired Eddy to work as a Coverage Review Pharmacist ("CRP") on its "newly formed" Coverage Determination Team ("CDT") [Doc. 28, ¶ 18; Doc. 48, ¶ 1]. The CDT was comprised of licensed pharmacists whose job responsibilities included deciding prescription drug coverage issues for Medicare members, responding to prescriber and member appeals, and ensuring that coverage decision letters met regulatory compliance [Doc. 48, ¶¶ 1, 2]. Eddy had performed similar coverage review work for Cigna and Aetna companies before joining BCBS [Doc. 59, ¶¶ 23, 24]. Eddy and the other members of the CDT worked remotely, handling prescription requests online and through phone calls as they came in [Doc. 50-9, pg. 1]. BCBS scheduled the CDT to start making coverage decisions beginning July 2, 2018 [Doc. 59, ¶ 9]. In preparation, BCBS trained the CDT pharmacists on the software used to make coverage determinations and gave them permission to copy and record the training [Doc. 48, ¶ 5]. BCBS also gave them time to review and study the applicable Medicare rules and regulations that pertained to coverage issues [Doc. 48, ¶ 5]. Before and after the team went live, BCBS developed several "job aids" to assist the CDT in its work [Doc. 43-1, pgs. 48-105].

At all times relevant to this action, Eddy suffered from Post-Traumatic Stress Disorder ("PTSD"), anxiety disorder and depression, and the effects of a Traumatic Brain Injury ("TBI") [Doc. 59, ¶¶ 1, 2]. Early in her employment at BCBS, Eddy advised her supervisor, Dr. Portia Moss ("Moss"), that she suffered from anxiety [Doc. 59, ¶ 33]. While Eddy appears initially to have done well at BCBS, problems soon surfaced with her work performance [Docs. 50-2; 50-7;

50-8]. On July 13, 2018, Moss emailed Eddy to inform her that she had improperly modified a case without informing her supervisors [Doc. 50-3, pg. 2]. On July 26, 2018, Moss provided Eddy with "verbal coaching" to help improve her performance [Doc. 48, ¶ 6; Doc. 59, ¶ 6]. Soon after, Eddy emailed Moss that she had been "having acute anxiety over my work performance since my last verbal formal written coaching," and stated, "I hope you will let me know more about what I am doing right and wrong." [Doc. 50-4]. The verbal coaching did not resolve the issues BCBS had with Eddy's work performance, so on September 14, 2018, Moss set up a telephone conference between herself, Eddy, and BCBS Human Resources Business Partner Shonnie Scruggs ("Scruggs") to address those concerns [Doc. 48, ¶ 7; Doc. 43-1, pg. 110]. Moss read from a prepared memorandum which noted Eddy's inability to "remain focused" and that she had "caused disruptions to the business." [Doc. 43-1, pg. 110]. In addition, Moss identified four problems with Eddy's job performance:

> (1) constructing work outside of [her] job requirements,
> (2) failure to follow processes and procedures,
> (3) excessively soliciting coworkers for information, and
> (4) lack of focus on the content of management communication.

[Doc. 43-1, pg. 110]. Moss advised Eddy that "[i]f significant improvement in your performance/behavior is not shown in the next 30 days, your employment will be terminated." [*Id*.]. Eddy did not receive the criticism well and immediately "had a severe anxiety attack and began crying and gasping for breath." [Doc. 59, ¶ 92; Doc. 48, ¶ 8]. Scruggs advised Eddy to contact BCBS's Accommodations Administrator Andrew Eldridge ("Eldridge") if she believed she needed a medical accommodation [Doc. 59, ¶ 92; Doc. 48, ¶ 8]. Eddy followed Scruggs' advice and contacted Eldridge, who provided her with the ADA medical accommodation forms around September 17, 2018 [Doc. 59, ¶ 37]. Eddy never completed the ADA forms, but she advised Eldridge, Moss and Scruggs of her continued efforts to obtain a medical provider's

recommendation for what accommodations might be available to her [Doc. 48, ¶ 11; Doc. 59, ¶ 38].

More than a week later, on September 25, 2018, Eddy contacted the "compliance investigator" Don Provoshna ("Provoshna") and complained about "the lack of detailed written procedures addressing the review and use of prior cases and claims history." [Doc. 59, ¶ 125; Doc. 55, pg. 55]. Eddy outlined her issues in an email to Provoshna, who forwarded it to BCBS Compliance Monitoring Consultant Julie Moses ("Moses") and asked her to review Eddy's concerns to "determine if we are within CMS Guidelines"[3] [Doc. 55, pgs. 52-53].

Two days later, on September 27, 2018, Moss met with Eddy again to discuss her job performance [Doc. 48, ¶ 12]. At this meeting, Moss brought several issues to Eddy's attention, including that Eddy "missed a meeting with Dr. Moss, failed to make more than one coverage determination on September 14th, and 17th, approved a case without the required documentation, failed to document her rationale in the decision tree, and did not follow proper procedures with respect to at least three other cases." [Doc. 48, ¶ 12].[4] That same day, Moss drafted a memorandum recommending Eddy's termination. Moss noted that Eddy's work performance had not improved since Moss warned her of these problems on September 14, 2018 [Doc. 43-1, pg. 115]. The Director of Clinical Pharmacy, Dr. Crescent Moore ("Moore"), reviewed Moss' recommendation and approved the termination [Doc. 48, ¶ 13; Doc. 43-1, pg. 115]. At this time, Eddy's employment with BCBS was still subject to the six month "introductory period" during which BCBS reserved the right to "terminate the employee without offering Performance Improvement Planning." [Doc. 43-1, pg. 44].

---

[3]     "CMS" refers to "Center for Medicare and Medicaid Services."

[4]     Eddy disputes each of these statements in her response [Doc. 48, ¶ 12, pgs. 10-11].

4

On October 2, 2018, Moss called Eddy to inform her of the decision to end her employment. When Moss called, Eddy was at the neuropsychologist's office for "all-day testing" to determine any cognitive impairment and potential accommodations [Doc. 50, ¶ 76]. Eddy answered Moss's call but told her she was at the doctor and could not talk. Moss responded by asking Eddy to "tell the doctor to wait," but Eddy declined to do so [Doc. 59, ¶ 120]. The call ended. Moss then wrote Eddy an email message informing her that she had been terminated "effective immediately due to poor performance." [Doc. 59, ¶ 123]. Shortly thereafter, Scruggs told BCBS security to place Eddy on a "do not admit at any location" list because Eddy had exhibited "extreme behaviors." [Doc. 59, ¶ 85]. This lawsuit followed.

## II.     STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden to demonstrate that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record

demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy*, *Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## III.  ANALYSIS

### A.  Eddy's claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*

#### 1.  Eddy's discrimination claim under the ADA.

Eddy alleges BCBS discriminated against her on the basis of her disability in violation of the ADA [Doc. 28, ¶ 64]. The ADA prohibits discrimination "against a qualified individual with a disability because of the [individual's disability]." 42 U.S.C. § 12112. A plaintiff may prove ADA discrimination through direct or indirect evidence. *Beery v. Associated Hygienic Products*, LLC, 243 F. App'x 129, 132 (6th Cir. 2007). Courts analyze indirect evidence of ADA discrimination using the three-step burden shifting framework set forth by the Supreme Court in *McDonnell-Douglas v. Green*, 411 U.S. 792, 802–06 (1973). By contrast, if a plaintiff can show direct evidence of discrimination, the Court need not engage in this burden shifting analysis. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). However, "[i]t is the rare situation when direct evidence of discrimination is readily available . . . ." *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).

6

## A. Direct Evidence

"Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Id*. (internal quotation marks omitted). Direct evidence has been referred to as "smoking gun" evidence that "explains itself." *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 683 (6th Cir. 2016). Eddy alleges that after BCBS fired her, Scruggs asked BCBS security to place her on a "do not admit to any location" list because Eddy had "exhibited extreme behaviors and may be a danger to others." [Doc. 57, pg. 100; Doc. 47, pg. 14]. Eddy says this is direct evidence of discrimination because Scruggs knew of Eddy's traumatic brain injury and had witnessed Eddy experiencing an "intense anxiety attack during a telephone conference" with supervisors [Doc. 47, pgs. 13-14]. Scruggs explained that she placed Eddy on the "do not admit" list because Eddy made phone calls and sent emails to BCBS personnel that "were a little concerning . . . due to their repetitive nature." [Doc. 57, pgs. 58-59]. BCBS argues Eddy has not provided direct evidence of discrimination because "no one at [BCBS] said anything to suggest to Plaintiff that her anxiety or depression diagnoses would impact the performance or continuation of her job." [Doc. 44, pg. 9, n.2].

As an initial matter, placing a recently terminated employee on a "do not admit" list is not evidence of direct discrimination. That is typically a reasonable security precaution taken by an employer to protect its own business affairs. Eddy cites to no cases which hold that practice as evidence of discrimination. Moreover, Eddy does not suggest that she had a reason to be on the premises at BCBS such that excluding her would constitute discrimination. In any event, placing her on the "do not admit" list is not direct evidence of discrimination because it requires the Court to make several inferences to conclude BCBS discriminated against her based on her conduct. It is not the "smoking gun" Eddy claims it is.

Eddy next argues the "close temporal proximity" between her "initiation of the formal ADA accommodations request process" and her termination constitutes direct evidence that "her disabilities were the basis for her termination." [Doc. 47, pgs. 14, 15]. It is true that BCBS fired Eddy less than two weeks after she began the formal accommodations process. But there is nothing in the record to show that BCBS ever spoke of Eddy's disabilities or mentioned her anxiety or depression in relation to her termination. While the close temporal proximity[5] between Eddy's accommodation request and her termination may indicate a causal relationship between those two events, it does not advance Eddy's theory that she was fired because she had a disability. Even considering the close temporal proximity Eddy raises, the Court would still need to make several inferences to find that Eddy's disabilities were the reason she was fired. Therefore, Eddy has not shown direct evidence of ADA discrimination.

## B. Indirect Evidence

That leaves indirect evidence. As noted, when a plaintiff seeks to establish an ADA discrimination claim through indirect evidence, the Court analyzes the claim using the *McDonnell Douglas* burden-shifting framework. *Talley v. Family Dollar Stores of Ohio, Inc*., 542 F.3d 1099, 1105 (6th Cir. 2008). To make a *prima facie* case, Eddy must show she is "(1) a disabled person

---

[5] One line of cases concludes that "[t]emporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence." *Dixon v. Gonzales*, 481 F.3d 324, 333-34 (6th Cir. 2007) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000)) (emphasis added). However, another line recognizes that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support the inference of retaliatory discrimination." *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 523 (6th Cir. 2008) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir.2000)). The Sixth Circuit has determined that "the two lines of cases are fully reconcilable." *Mickey*, 516 F.3d at 525. In cases where the adverse employment action occurs "very close in time after the employer learns of a protected activity," temporal proximity alone can suffice to establish causation. *Id*. at 524 (reviewing cases and noting that "only 13 days," and "less than three weeks," are both time frames short enough to show, on their own, a causal connection between protected activity and adverse employment action).

8

within the meaning of the [ADA], (2) that [s]he is otherwise qualified to perform the essential functions of [her] job with or without reasonable accommodation, and (3) that [s]he suffered an adverse employment decision due to [her] disability." *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 810 (6th Cir. 1999). Once an employee establishes her *prima facie* case, the burden shifts to the employer to offer a "legitimate, nondiscriminatory reason for its action." *Id.*

BCBS argues Eddy has not met the first element because she "cannot show that she was 'regarded as' disabled" as alleged in her amended complaint [Doc. 44, pg. 10]. Eddy's amended complaint states that "BCBST regarded Dr. Eddy as having a disability." [Doc. 28, ¶ 60]. BCBS seems to argue that because Eddy used the phrase "regarded as" disabled, the other definitions of disability in the ADA are not available to her. However, the next paragraph of the complaint alleges that Eddy's "traumatic brain injury, PTSD, and anxiety were and are 'disabilities' within the meaning of the [ADA]." [Doc. 28, ¶ 61]. The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102 (1). BCBS does not dispute that Eddy suffers from PTSD and the effects of a traumatic brain injury, nor does it dispute that she has been diagnosed with anxiety disorder and depression that "substantially limit one or more [of her] major life activities." [Doc. 59, ¶¶ 1, 2, 3]. Therefore, Eddy is "an individual with a disability" as defined in the ADA and has met the first element of her *prima facie* discrimination claim.

BCBS next argues Eddy's claim fails on the second element because she is not a "qualified individual with a disability." [Doc. 44, pg. 11]. To be "qualified" under the ADA, the employee must be able to "'perform the essential functions of the job with or without reasonable accommodation.'" *E.E.O.C. v. Ford Motor Co*., 782 F.3d 753, 761 (6th Cir. 2015) (quoting 42 U.S.C. § 121118(8)). "A job function is essential if its removal would fundamentally alter the

9

position." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018) (quoting *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001)). "Put another way, essential functions are the core job duties, not the marginal ones." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018) (citing 29 C.F.R. § 1630.2 (n)(1)). An individual who cannot perform the essential functions of a job is not qualified for that job, and in such cases, the ADA does not apply. *Dietelbach v. Ohio Edison Co.*, 1 Fed. App'x. 435, 436–37 (6th Cir. 2001).

BCBS argues "the ability to work independently with minimal supervision" was an essential function of Eddy's job [Doc. 48, ¶ 3]. In determining whether a function is essential, courts consider such factors as "(1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs." *Bush v. Compass Grp. USA, Inc.,* 683 F. App'x 440, 446 (6th Cir. 2017) (internal citation omitted); *see also* 29 C.F.R. § 1630.2(n)(3) (vi-vii).

On balance, these factors support the conclusion that working independently with minimal supervision was an essential function of Eddy's job. First, BCBS expected, and Eddy does not dispute, that "judgment and discretion" were requirements for the position [Doc. 43-1, pg. 13; Doc. 59, ¶ 57]. Indeed, BCBS hired only licensed pharmacists to the CDT because the task of reviewing prescription drug coverage requests necessitated the exercise of independent judgment and professional training [Doc. 43-1, pg. 43]. Second, BCBS circulated a written job description for the CRP position which provided that applicants must be able "to work independently with minimal supervision." [Doc. 43-1, pg. 43]. Third, Eddy spent most of her time as a CRP working independently to review individual claims and appeals. In fact, BCBS expected each pharmacist to review about forty cases per day [Doc. 43-2, ¶ 5; 43-1, pg. 115]. Fourth, if Eddy did not perform

10

her job duties, this would result in a heavier workload for her coworkers. BCBS notes that if Eddy did not make the requisite coverage determinations on a particular day, another member of the team would need to work longer hours to complete them [Doc. 44, pg. 12; Doc. 43-2, ¶ 9]. Lastly, there is not enough evidence in the record to judge the work experience of prior or current incumbents in the CRP position, so those factors are neutral. In essence, BCBS hired pharmacists to use their expertise and independent medical judgment to make daily decisions about whether Medicare covered certain prescription drugs. There is no genuine issue of fact regarding whether the ability to work independently with minimal supervision was an essential function of Eddy's job. It clearly was.

The next issue is whether Eddy has shown she could perform the essential function of her job with or without reasonable accommodations. Eddy claims that she "could have performed the essential functions of her job with a reasonable accommodation of detailed, clear, written processes and procedures." [Doc. 47, pg. 11]. BCBS counters that her request for detailed, written instructions was unreasonable because it negated the essential decision-making function Eddy was required to perform as a CRP [Doc. 44, pg. 12].

To assist CDT pharmacists in their work, BCBS provided voluminous written job aids. Eddy had access to all training materials and could record the training sessions for later review [Doc. 43-1, pgs. 13-14, 15-24; 48-105]. Eddy claims these training materials were not enough to do her job. She claims she also needed "written processes and procedures addressing the complicated timing issues in each coverage determination scenario [to] be sure she was making decisions on coverage determination requests consistently with the entire team and with Medicare regulations." [Doc. 59, ¶ 55]. But to provide written instructions for "each coverage determination scenario," BCBS would need to review the timing details of each individual Medicare coverage request, check these against Medicare regulations, and provide a written rubric for each unique

11

situation to help the pharmacist decide whether to grant or deny each request. Eddy admits that these tasks were part of her job as a CRP, as she acknowledges that "as a Coverage Review Pharmacist, [she] was responsible for making decisions about whether to approve or deny coverage for prescription drugs for Medicare members in accordance with Medicare rules and regulations." [Doc. 48, ¶ 2]. The "written processes and procedures" Eddy wanted for every Medicare coverage scenario would negate this essential function of her job. Accordingly, her request that BCBS provide her with this type of instruction was *per se* unreasonable. *E.E.O.C. v. Ford Motor Co.,* 782 F.3d 753, 761 (6th Cir. 2015) (a "reasonable accommodation may include job restructuring [and] modified work schedules[, b]ut it does *not* include removing an 'essential function' from the position, for that is *per se* unreasonable.") (internal citations and quotation marks omitted) (emphasis in original). Even though this accommodation request was unreasonable, Eddy admits she could not perform her job duties without it. Therefore, Eddy was not qualified for the CRP position, because, by her own admission, she was unable to perform the job with or without reasonable accommodation. For this reason, Eddy has not met the second element of her *prima facie* case, and her ADA discrimination claim fails.

BCBS has shown it is entitled to judgment as a matter of law on Eddy's claim of discrimination under the ADA because there are no issues of material fact in dispute. Accordingly, BCBS's motion for summary judgment as to Eddy's ADA discrimination claim is **GRANTED**, and Eddy's discrimination claim under the ADA is **DISMISSED**.

### 2. Eddy's retaliation claim under the ADA.

Eddy claims BCBS "retaliated against [her] because she sought a reasonable accommodation of her disabilities" in violation of the ADA [Doc. 28, ¶ 65].[6] Like an ADA

---

[6] Notably, BCBS does not separately address Eddy's ADA retaliation claim in its motion for summary judgment.

12

discrimination claim, an ADA retaliation claim is analyzed using the *McDonnell Douglas* burden shifting framework. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 396 (6th Cir. 2017). "To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity under the ADA, (2) her employer was aware of that activity, (3) she suffered an adverse employment action, and (4) a "causal connection" existed between the protected activity and the adverse action." *Id*.

Eddy has clearly met the third element of her *prima facie* ADA retaliation claim, that she suffered an adverse employment action when BCBS terminated her employment. As to the first element, an employee's request for an accommodation is "protected activity" for purposes of a retaliation claim. *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013). Eddy can show she was engaged in protected activity under the ADA because she was seeking a reasonable accommodation for her disabilities through the ADA application process when she was fired. It is undisputed that, at the suggestion of Scruggs, Eddy reached out to Eldridge, who sent her the "medical accommodations paperwork" needed to apply for ADA accommodations [Docs. 50-20, pgs. 3-9; 50-21, pg. 2]. The record also reflects that after receiving the forms, Eddy made appointments with a general physician and a neuropsychiatrist for recommendations and to complete the forms [Doc. 50-28, pgs. 1-2].

Regarding the second element, BCBS was aware Eddy was seeking accommodations because she kept BCBS well informed of her progress in completing the ADA accommodations application forms. In an email dated September 18, 2018, Eddy wrote to Eldridge and copied Scruggs that she had made an appointment with a counselor for the purpose of "defining any accommodations needed." [Doc. 43-1, pg. 106]. In a follow-up email dated September 30, 2018, Eddy informed Scruggs that she would "have all day testing for the accommodations" on October 2, 2018, and that the "ADA form should be available soon after that." [Doc. 50-30, pg. 1]. These

13

communications show that Eddy was actively making doctor appointments for the purpose of filling out the ADA accommodations forms, and BCBS was aware of the process.

As to the fourth element, causation, Eddy argues the "close temporal proximity" between her "initiation of the formal ADA accommodations request process" and her termination constitutes direct evidence that "her disabilities were the basis for her termination." [Doc. 47, pgs. 14, 15]. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation." *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008). Here, Moss recommended termination only 13 days after Eddy confirmed that she was seeking an ADA accommodation, and BCBS fired Eddy 15 days after she received the accommodation request forms [Doc. 59, ¶¶ 79, 81]. This brief time frame can create an inference of causation between Eddy's official request for accommodations and her termination. *See McNett v. Hardin Cmty. Fed. Credit Union,* 118 F. App'x 960, 965 (6th Cir. 2004) ("employer's knowledge of the protected activity coupled with an adverse action occurring [13 days later] can create an inference of causation . . . .").

A causal connection is even stronger when "temporal proximity [is] considered along with other evidence of retaliatory conduct." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). In the September 14 memorandum, Moss warned Eddy that she had 30 days to improve her work performance or be terminated. Less than two weeks later, Moss recommended Eddy's termination [Doc. 43-1, pg. 110]. The fact that BCBS initially gave Eddy 30 days to improve her job performance but shortened that time by half after she formally sought ADA accommodations raises a question of fact as to what ultimately motivated the decision to fire her. Such a factual

14

inquiry is better left for a jury to decide.  For these reasons, Eddy has met her burden to present a *prima facie* case of retaliation for seeking accommodations under the ADA.

Once a plaintiff presents a *prima facie* case of ADA retaliation, the burden shifts to the defendant "to articulate a nondiscriminatory reason for its action." *E.E.O.C. v. Ford Motor Co*., 782 F.3d 753, 767 (6th Cir. 2015).  BCBS argues it has met this burden by showing Eddy's "poor job performance even after receiving warnings, coachings, and additional guidance on a regular basis." [Doc. 44, pg. 13].  BCBS lists several examples of Eddy's poor job performance, including that she:

- Excessively solicited her co-workers for information.
- Constructed work outside of her job requirements by creating guidance and, without approval, sending it to her team, which caused confusion.
- Failed to follow processes and procedures.
- Lacked focus on the content of management communication.
- Skipped a meeting with Dr. Moss.
- On two separate occasions, failed to make more than one coverage determination during an 8-hour shift, contrary to the expectation that Coverage Review Pharmacists would complete forty determinations per shift.
- Approved a case without the required documentation, failed to document her rationale in the decision tree, and did not follow proper procedure with respect to at least three other cases.

[Doc. 44, pg. 13].  BCBS provides documentation that Moss communicated with Eddy about these problems.  The first was the September 14 memorandum [Doc. 43-1, pg. 110], and the second was a telephone conference between Moss and Eddy on September 27, 2018, memorialized in "notes" that Moss later emailed to Eddy [Doc. 43-1, pgs. 113-114; Doc. 48, ¶ 12].   In the September 14 memorandum, Moss wrote that Eddy "(1) construct[ed] work outside [of] job requirements, (2) fail[ed] to follow processes and procedures, (3) excessively solicit[ed] coworkers for information, and (4) lack[ed] focus on the content of management communication." [Doc. 43-1, pg. 110]. Moss

wrote that Eddy had been "counseled on multiple occasions" about these concerns and listed dates upon which the counseling supposedly occurred [*Id.*].

Eddy argues the September 14 memorandum contains only "generalized criticisms," for which BCBS has no support in the record [Doc. 48 ¶ 7; Doc. 50, ¶ 59]. Eddy claims some of the counseling dates listed by Moss never happened because they were cancelled or rescheduled [Doc. 50, ¶ 63 (b), (d)]. For the counseling sessions that did occur, Eddy states they were not all about problems with her performance, but that Moss actually praised her work during some of these discussions [Doc. 50, ¶ 63 (a)-(h)]. Eddy states that Moss asked Eddy to help "the group stay on topic" during training, asked Eddy to "help encourage" others to speak up and "think through cases," "thanked [Eddy] for suggesting updates [to] improve communications," suggested Eddy take a leadership role in team meetings, and encouraged Eddy to implement improvements to pharmacist communications [Doc. 50, ¶ 63]. Eddy acknowledges that Moss criticized her during the September 12th "one-on-one meeting," and told Eddy she should not be sending her own "job aids or guidance to others," and that Eddy should not be doing Moss's job [Doc. 50, ¶ 63(h)]. Eddy explains that Moss "believed [Eddy] may have misunderstood her request that [Eddy] show her peers how they could have decided a case differently." [*Id.*]. According to Eddy, Moss concluded that meeting by saying, "it's not a problem, it is more that we are just kind of growing and getting there together, and we'll get there." [*Id.*].

On September 27th, Moss raised more specific complaints about Eddy's job performance, but Eddy disputes the truth of each in turn. Moss stated that Eddy had skipped a planned meeting with Moss, but Eddy counters that she thought the meeting had been cancelled [Doc. 48, ¶ 12]. Moss stated that Eddy "failed to make more than one coverage determination" on two separate occasions, but Eddy claims she "was sick the entire day, did not work, and used 8.0 hours of Paid Time Off with [BCBS] approval for [one of those days]." [Doc. 48, ¶ 12; Doc. 57, pg. 86]. As to

16

the other instance, Eddy does not "remember any day [she] worked in which [she] only completed one case." [Doc. 50, ¶ 94]. Moss told Eddy she failed to properly document approvals in the "decision tree," [Doc. 48, ¶ 12], but Eddy states there was "no written process or procedure" for where to document coverage rationale in the decision tree, and that she "typically" documented the required information "in the comment box below the decision tree question, as she was shown in training." [*Id*.]. Finally, Eddy disputes Moss's statement that she "did not follow proper procedure with respect to at least three other cases." [*Id*.]. Eddy explains that "there were many different types of coverage determination cases," requiring different procedures which the team had not yet encountered and "for which the appropriate procedures were undefined." [*Id*.]. Eddy avers she always "consulted with Dr. Moss about the appropriate procedures," in such instances [*Id*.].

On this record, there is a genuine issue of material fact as to whether BCBS had a legitimate reason for terminating Eddy's employment. The facts supporting BCBS's reasons are all statements by Moss, each of which Eddy places at issue. To conclude that BCBS had a legitimate reason for firing Eddy, the Court would need to decide that Moss was more believable than Eddy. But "[w]here the district court must assess the relative credibility of witnesses, the case is particularly inappropriate for summary judgment and requires a full hearing on the merits." *In re Atlas Concrete Pipe, Inc.,* 668 F.2d 905, 909 (6th Cir. 1982) (internal citations omitted). For this reason, BCBS's motion for summary judgment as to Eddy's ADA retaliation claim is **DENIED**.

### 3. Eddy's failure to accommodate claim under the ADA.

Eddy alleges BCBS "failed and refused to provide a reasonable accommodation" to enable her to perform her job duties as a Coverage Review Pharmacist," [Doc. 28, ¶ 66]. In ADA accommodation cases, "[t]he disabled individual bears the initial burden of proposing an accommodation and showing that accommodation is objectively reasonable." *Brown v. Chase*

17

*Brass Copper Co., Inc*., 14 F. App'x 482, 487 (6th Cir. 2001) (internal citation omitted). The employer then must show "whether a proposed accommodation would impose an undue hardship." *Id*.

Eddy's accommodation request was for more detailed, written instructions for each possible scenario she faced as a CRP, but as stated above, that request is unreasonable because providing that "accommodation [would] exempt[] her from an essential function" of her job. *E.E.O.C. v. Ford Motor Co.,* 782 F.3d 753, 763 (6th Cir. 2015). Not only that, but it would impose an undue hardship on BCBS to provide such written instructions. Consequently, Eddy has not met her burden to show that BCBS failed to accommodate her disabilities under the ADA. Accordingly, BCBS's motion for summary judgment as to this claim is **GRANTED**, and Eddy's failure to accommodate claim under the ADA is **DISMISSED**.

**B.     Eddy's failure to accommodate claim under the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq*.**

Eddy claims BCBS "completely failed to engage in the interactive process required under the TDA to identify the precise limitations resulting from [her] disabilities and potential accommodations that could overcome those limitations." [Doc. 28, ¶ 76]. Eddy also claims BCBS retaliated against her in violation of the TDA "because she sought a reasonable accommodation of her disabilities." [Doc. 28, ¶ 78].

"Generally speaking, discrimination claims under the [TDA] are comparable to ADA claims . . . ." *Burress v. City of Franklin, Tenn*., 809 F. Supp. 2d 795, 817 (M.D. Tenn. August 17, 2011). But "the language of the TDA differs from that of the ADA insofar as the former does not contain a 'reasonable accommodation' element." *Id*.; *see also Oliver v. Titlemax*, 149 F. Supp. 3d 857, 866 (E.D. Tenn. 2016). Hence, "employers are not required to provide reasonable accommodations under the TDA." *Burress*, 809 F. Supp. 3d at 817 (internal citations omitted).

18

Accordingly, BCBS's motion for summary judgment on this claim is **GRANTED**, and Eddy's TDA failure to accommodate claim is **DISMISSED**.

## C.    Eddy's retaliation claim under the TDA

Eddy's TDA retaliation claim also fails because it is premised on her request for accommodation. *Id.* at 818 ("As Tennessee law does not require employers to make a reasonable accommodation, it follows that requesting an accommodation is not protected activity."). BCBS's motion for summary judgment as to Eddy's TDA retaliation claim is therefore **GRANTED**, and Eddy's claims in this regard are **DISMISSED**.

## D.    Eddy's retaliation claim under the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

Eddy claims BCBS terminated her employment for "refusing to participate in and for refusing to remain silent about [BCBS's] illegal activities"[7] in violation of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304 [Doc. 28, ¶ 102]. To prevail on a "whistleblower" claim under the TPPA, a plaintiff must prove that "(1) the plaintiff was an employee of the defendant; (2) the plaintiff refused to participate in or remain silent about illegal activity; (3) the defendant employer discharged or terminated the plaintiff's employment; and (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain

---

[7]    Eddy alleges that she was fired both for refusing to participate in illegal activity, and for refusing to remain silent about them. She states that during her employment with BCBS she "recognized that [BCBS] coverage determinations were not being carried out in accordance with the processes orally outlined in training and that Medicare Part D pharmacy benefits coverage determinations were being delayed by [BCBS]." [Doc. 28, ¶ 91]. Eddy claims that when she brought this "regulatory compliance issue" to Moss's attention, Moss criticized her for "sharing her knowledge of CMS guidelines and coverage review processes" with her team [Doc. 28, ¶ 14]. In her complaint, Eddy lists the Medicare regulations purportedly violated [Doc. 28, ¶ 105]. Eddy claims that Moss told her she needed to "stop communicating" with BCBS personnel "about her concerns with regulatory compliance." [Doc. 28, ¶ 99]. Eddy claims BCBS terminated her employment "shortly after she contacted the Compliance Department" about these issues [Doc. 28, ¶ 100].

19

silent about the illegal activity." *Williams v. City of Burns*, 465 S.W.3d 96, 111 (Tenn. 2015) (internal citations omitted). As with an ADA retaliation claim, the burden then shifts to the defendant to proffer a legitimate, non-discriminatory reason for Eddy's termination. *Williams v. City of Burns*, 465 S.W.3d 96, 111, 112 (Tenn. 2015) (applying the *McDonnell Douglas* burden shifting framework to a TPPA retaliatory discharge claim).

BCBS argues Eddy cannot establish the fourth element, "sole causation," because she "admits her belief that there were multiple competing forces motivating her termination." [Doc. 44, pg. 19]. "The TPPA requires the plaintiff to show her whistleblowing was the sole, or exclusive causal reason for her termination . . . ." *Treadaway v. Big Red. Powersports, LLC*, 611 F. Supp. 2d 768, 783 (E.D. Tenn. 2009) (internal quotation marks and citations omitted). By requiring a showing of sole causation, the Tennessee legislature chose to "enact a stringent standard and set the bar high for recovery" under the TPPA. *Sykes v. Chattanooga Housing Authority*, 343, S.W.3d 18, 28 (Tenn. 2011). Consequently, "[a] plaintiff has a 'formidable burden' in establishing the fourth element [of a TPPA claim]." *Wheeler v. Jackson Nat'l Life Ins. Co.*, 159 F. Supp. 3d 828, 861 (M.D. Tenn. 2016).

Here, Eddy has not shown "whistleblowing" was the sole cause of her termination. She also claims BCBS terminated her for her disability and for raising a need for accommodation [Doc. 28, ¶¶ 56-86; Doc. 43-1, pg. 32]. Eddy expressly asserts the TPPA claim "in the alternative" to her ADA discrimination claims [Doc. 28, ¶ 101], and argues that she can allege alternative, inconsistent theories pursuant to Fed. R. Civ. P. 8(d)(3). She is correct that "a party may state as many separate claims or defenses as it has, regardless of inconsistency." [Doc. 47, pg. 23]. But this does not change the fact that she has failed to provide evidence that her whistleblowing activity was the sole cause of her termination.

Moreover, BCBS's burden to show a legitimate, non-discriminatory reason for discharging Eddy is lower under the TPPA than it is under the ADA. For a TPPA claim, an employer need only show that unlawful retaliation "was not the *sole* cause of the employment action." *Williams v. City of Burns*, 465 S.W.3d 96, 115 (Tenn. 2015) (internal citations omitted) (emphasis in original). In other words, BCBS must show that "even if retaliation was a motivation for the discharge, there was at least one non-retaliatory reason as well." *Id*. The proffered non-retaliatory reason "need not be a sound one, it need only be a reason *other than* retaliation." *Id*. (emphasis in original). The record shows that Moss raised several concerns about Eddy's job performance in the memorandum dated September 14, 2018, concerns not related to any whistleblowing on Eddy's part. Further, Moss sent the memorandum more than a week *before* Eddy contacted the BCBS compliance department, destroying any argument that Moss's job-related concerns were mere pretext for firing Eddy in retaliation for whistleblowing. Here, it does not matter whether Moss's reasons for threatening to fire Eddy were sound or reasonable, only that they were non-retaliatory. Therefore, BCBS's motion for summary judgment as to Eddy's TPPA retaliatory discharge claim is **GRANTED**, and her claim in this regard is **DISMISSED**.

## E.  Intentional infliction of emotional distress.

Eddy alleges BCBS committed the tort of intentional infliction of emotional distress through the actions of its managers Moss, Moore, and Scruggs [Doc. 28, ¶¶ 81-86]. Eddy states BCBS manager Moss "persisted in criticizing and belittling [her], and pressure[ed her] to falsely certify facts on Medicare documents." [Doc. 28, ¶ 82]. Eddy also asserts that Moss and Scruggs "tried to prevent" her from receiving the medical evaluation for her disability accommodation by "calling" her during the evaluation and "asking her to 'tell the doctor to wait'" so they could fire her before the evaluation was complete [Doc. 28, ¶ 83].

21

"There are three elements to a cause of action for intentional infliction of emotional distress under Tennessee law: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Am. Nat. Prop. & Cas. Co. v. Stutte*, No. 3:11-CV-219, 2015 WL 268994, at *4 (E.D. Tenn. Jan. 21, 2015) (citing *Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn. 1997)). Courts in Tennessee have adopted a "high threshold standard" for deciding whether particular conduct is "so intolerable as to be tortious." *Bain*, 936 S.W.2d at 633-34. In determining whether conduct is "outrageous," courts are instructed to follow the Restatement (Second) of Torts:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

Restatement (Second) of Torts, Section 46, Comment D; *see Miller v. Willbanks*, 8 S.W.3d 607, 616 (Tenn. 1999). Under this high standard, "mere insults, indignities, threats, annoyances, petty oppression or other trivialities" are not recognized as "outrageous." *Bain*, 936 S.W.2d at 622.

The Court will first address Eddy's allegation that Moss pressured her to file false claims. Assuming this is true, Moss would be advocating for Eddy to engage in criminal activity. But the Restatement is clear that even where "the defendant acted with an intent which is … criminal" or acted with "malice" or where such conduct would justify "punitive damages for another tort," such conduct is not sufficient to constitute "outrageous" conduct for this tort. *See also Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004) ("[W]e have emphasized that it is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress…."). With that exacting standard in mind, Eddy complains that Moss

22

pressured her to file false claims – an act that would be criminal if true. But under Tennessee law, that fails to meet the standard for outrageous conduct. *See also Sacharnoski v. Cap. Consol., Inc.*, 187 F. Supp. 2d 843, 845 (W.D. Ky. 2002) (district court found an employer pressuring its employee to falsify his employment records was not "outrageous conduct" under Kentucky law).

Eddy's other allegations do not rise to the level required to succeed on a claim for IIED. It is undisputed that Moss "disciplined or criticized" Eddy for "communicating with other team members," and for creating "confusion" among coworkers [Doc. 59, ¶ 76]. Not only did Moss criticize Eddy's job performance, she threatened to fire her on at least two occasions [Doc. 43-1, pgs. 110-114]. But none of Moss's communications to Eddy come close to being outrageous, extreme, or intolerable in a civilized society. Finally, it is undisputed that Moss called Dr. Eddy to terminate her employment while Eddy was undergoing testing at the neuropsychologist's office, and asked Eddy if she could "tell the doctor to wait." [Doc. 59, ¶¶ 119, 120, 123]. While this may have been insensitive, it was not extreme and outrageous, and does not satisfy the second prong of an IIED claim. For these reasons, BCBS's motion for summary judgment as to Eddy's claim of intentional infliction of emotional distress is **GRANTED**, and Eddy's claim for IIED is **DISMISSED**.

## IV.    CONCLUSION

For the reasons stated herein, BCBS's motion for summary judgment as to Eddy's ADA retaliation claim is **DENIED.**    As to all other claims, the motion for summary judgment is **GRANTED** and those claims are **DISMISSED WITH PREJUDICE.**

SO ORDERED:

s/Clifton L. Corker
United States District Judge